## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:22-cr-254 (RC)** |
| **TYLER ETHRIDGE,** | : | |
| | : | |
| **Defendant.** | : | |

## JOINT STATEMENT OF ELEMENTS AND FACTS FOR BENCH TRIAL WITH STIPULATED FACTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and defendant Tyler Ethridge, by and through his counsel (collectively, "the parties"), hereby submit a joint statement of the elements and facts to support a bench trial with stipulated facts in this action.

**I.    Elements**

**A.  *Count One: Civil Disorder***

The essential elements of the offense of civil disorder, in violation of 18 U.S.C. § 231(a)(3), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with a law enforcement officer;

2. At the time of the defendant's actual or attempted act, the law enforcement officer was engaged in the lawful performance of his official duties incident to and during a civil disorder; and

3. The civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did, said, or perceived.

A "civil disorder" is defined as any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

The term "commerce" means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia.

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

The term "department" includes one of the departments of the executive branch (such as the Department of Homeland Security, which includes the United States Secret Service) or the legislative branch. The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States. The term "instrumentality" includes any other formal entity through which the government operates, such as Congress or the United Sates Capitol Police.

For the U.S. Capitol Police and Metropolitan Police Department on January 6, 2021, the term "official duties," means policing the U.S. Capitol Building and Grounds, and enforcing federal law and D.C. law in those areas.

### B.  Count Two: Obstruction of an Official Proceeding

The essential elements of the offense of obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge attempted to or did obstruct or impede an official proceeding;

2. Defendant Tyler Ethridge intended to obstruct or impede the official proceeding;

3. Defendant Tyler Ethridge acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and

4. Defendant Tyler Ethridge acted corruptly.

The essential elements of aiding or abetting the commission of the offense of obstruction of an official proceeding, in violation of 18 U.S.C. § 2, each of which the government must prove beyond a reasonable doubt, are as follows:

1. At least one other person committed obstruction of an official proceeding by committing each of the elements of that offense;

2. Defendant Tyler Ethridge knew that obstruction of an official proceeding was going to be committed or was being committed by at least one other person;

3. Defendant Tyler Ethridge performed an act or acts in furtherance of the offense;

4. Defendant Tyler Ethridge knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging at least one other person in committing the offense of obstruction of an official proceeding; and

5. Defendant Tyler Ethridge did that act or acts with the intent that at least one other person commit the offense of an obstruction of an official proceeding.

### C. Count Three: Entering and Remaining in a Restricted Building or Grounds

The essential elements of the offense of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge entered or remained in a restricted building or grounds without lawful authority to do so; and,

2. Defendant Tyler Ethridge did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

### D. Count Four: Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The essential elements of the disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

2. Such conduct occurred when, or so that, such conduct, in fact, impeded or disrupted the orderly conduct of Government business or official functions; and

3. Defendant Tyler Ethridge did so knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions.

"Disorderly conduct" is conduct that tends to disturb the public peace or undermine public safety.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

The terms "restricted building or grounds" and "person protected by the Secret Service" have the same meanings described above in Subsection C.

### E. Count Five: Disorderly Conduct in a Capitol Building or Grounds

The essential elements of the offense of disorderly conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds;

2. Defendant Tyler Ethridge did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and

3. Defendant Tyler Ethridge acted willfully and knowingly.

### F. Count Six: Parading, Demonstrating, or Picketing in a Capitol Building

The essential elements of the offense of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G), each of which the government must prove beyond a reasonable doubt, are as follows:

1. Defendant Tyler Ethridge paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and

2. Defendant Tyler Ethridge acted willfully and knowingly.

## II.    Facts

### A. The Attack at the U.S. Capitol on January 6, 2021.

1.    The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police ("USCP"). Restrictions around the

Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in 18 U.S.C. § 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session is set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18 and requires a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. This joint session of Congress was an official proceeding as that term is used in 18 U.S.C. § 1512. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the

Capitol and the proceedings underway inside. By shortly after 1:00 p.m., the situation at the Capitol had become a civil disorder as that term is used in 18 U.S.C. § 231, and throughout the rest of the afternoon the civil disorder obstructed the USCP's ability to perform their federally protected function to protect the U.S. Capitol building and its occupants. The civil disorder also obstructed, delayed, and adversely affected commerce and the movement of articles and commodities in commerce.

5.      Officers from the Washington, D.C., Metropolitan Police Department ("MPD") on the U.S. Capitol grounds and in the U.S. Capitol building were assisting officers from the USCP. The MPD and USCP officers were policing and protecting the U.S. Capitol Building and Grounds and the building's occupants and enforcing federal law and D.C. law in those areas, all of which was part of their official duties that day.

6.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP and MPD were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

7.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP and MPD attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd

encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.7 million dollars for repairs.

8.      Shortly thereafter, at approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### B. Defendant Tyler Ethridge's Participation in the January 6, 2021, Capitol Riot

9.      In the fall of 2020, Ethridge's friend ("Person-1") offered Ethridge a paid-for, roundtrip plane ticket and Airbnb stay to attend former President Donald Trump's rally in Washington, D.C. on January 6, 2021.

10.     On January 4, 2021, Ethridge, Person-1, and Person-1's son flew from Denver International Airport to Philadelphia International Airport. The three then rented a car and drove to Washington, D.C. to meet Person-2, who helped Person-1 organize the trip.

11.     On January 6, 2021, Ethridge, Person-1, Person-1's son, and Person-2 took an Uber to the Washington Monument to attend the rally. Midway through former President

Trump's speech, Ethridge, Person-1, and Person-1's son walked with the crowd to the U.S.

Capitol Building along the Pennsylvania Avenue approach.

12.    At approximately 12:55 p.m., on restricted Capitol Grounds near the Peace Circle,

Ethridge, along with the crowd, was briefly stymied, by mesh fencing and a set of bicycle rack

barricades, which bore "Area Closed" signs and were guarded by a small group of U.S. Capitol

Police ("USCP") and Metropolitan Police Department ("MPD") officers, blocking the path to the

U.S. Capitol Building, as shown in Exhibit 1.



*Exhibit 1: mesh fencing and bicycle rack barricades, bearing "Area Closed" signs, blocking the path to the U.S. Capitol building.*

13.    After a few minutes, the crowd—including Ethridge—surged forward, destroying

the barricades, overwhelming the police officers, and knocking USCP Officer C.E. to the ground,

injuring her. *See* Exhibits 2, 3.





*Exhibit 2: Officer C.E.'s injured eye*          *Exhibit 3: Officer C.E.'s bruised leg*

14.     Ethridge participated in this surge, which was the first breach of the Capitol's

perimeter fencing. Specifically, Ethridge not only pushed forward, past the police, but also

helped remove the fencing erected on the northwest approach to the U.S. Capitol, and that

fencing bore a large sign declaring "Area Closed." Ethridge thus facilitated the rioters' breach of

the U.S. Capitol's defenses. *See* Exhibit 3.



*Exhibit 3: Screenshot of video of Ethridge (circled in yellow) helping to remove fencing along the northwest approach to the U.S. Capitol.*

15.     In pushing past the police and helping to destroy the fencing as described above, Ethridge knowingly acted with the intended purpose of obstructing, impeding, and interfering with those MPD and USCP officers, who were at the time engaged in the lawful performance of their official duties incident to and during the ongoing civil disorder. Ethridge also acted knowing that he did not have lawful authority to enter the restricted grounds.

16.     Ethridge proceeded with the crowd past the barricades to the West Plaza outside of the U.S. Capitol building. There, while people in Ethridge's earshot chanted "Stop the steal! Stop the steal!", Ethridge was pepper-sprayed and shot with rubber bullets by police officers attempting to control and disperse the crowd. As Ethridge documented via a video he posted on social media, one of the rubber bullets struck Ethridge in the knee, causing him to yelp in pain, and the pepper spray caused him to cough. *See* Exhibit 4.



*Exhibit 4: Screenshot of video posted to Parler of Ethridge on the West Plaza holding up a rubber bullet round and exclaiming "I just got shot in the knee!" In the same video, Ethridge pans and shows pepper spray cannisters launched by law enforcement officers landing amongst the crowd.*

17.    Instead of leaving the Capitol grounds, Ethridge climbed a media scaffolding and

exhorted the crowd to continue fighting. *See* Exhibit 5.



*Exhibit 5: Photograph of Ethridge (circled in yellow) standing on the northwest media scaffolding.*

18. Ethridge was aware that Congress was meeting during the afternoon of January 6, 2021, to certify the Electoral College vote for the winner of the 2020 presidential election and wished to stop that official proceeding, as he believed the 2020 presidential election had been fraudulent or "stolen."

19. While on the media scaffolding, Ethridge received a text from Person-1 directing him to meet at the statute of Ulysses S. Grant outside of the Capitol. Ethridge climbed down the media scaffolding and waited at Grant's statue for approximately 10–15 minutes for Person-1 but Person-1 did not appear. While waiting for Person-1, Ethridge observed people going up the stairs and into the Capitol building, so he joined the crowd.

20.     At approximately 2:35 p.m., Ethridge entered the Capitol building via the Upper

West Terrace Door, as captured on the Capitol's surveillance cameras. *See* Exhibit 6. At the

time he entered the U.S. Capitol, Ethridge knew he lacked lawful authority to enter the building.



*Exhibit 6: Photograph of Ethridge (circled in red) entering the U.S. Capitol building via the Upper West Terrace doors.*

21.     From there, Ethridge proceeded to the Rotunda. As he walked to and then up the

stairs leading to the Rotunda, Ethridge recorded video on his cell phone. In that video, loud

alarms are blaring as Ethridge urges another protestor to "cover your face," further illustrating

that Ethridge knew he lacked lawful authority to be in the building. *See* Exhibit 7.

22.     Ethridge stayed in the Rotunda for approximately three minutes While in the

Rotunda, police officers attempting to control and disperse the crowd deployed more pepper

spray, and again Ethridge suffered its effects. Rather than exit the Capitol, Ethridge remained

and filmed several videos that he posted to social media. *See* Exhibits 9-10. During these videos,

Ethridge made statements such as:

    a. "We stormed the Capitol. [. . .] This is amazing. I hope this doesn't get me thrown in jail. I'm officially a pastor. This is what pastors need to do. […] Christians, we need to infiltrate every area of society like this. Every area of society like this. Peacefully. But if it takes a little bit of aggression to barge through the walls that Satan separates us from the culture, it's time for the body of Christ to infiltrate the culture." Exhibit 9; and

    b. "I don't want to say what we're doing is right. But if the election is being stolen, what is it going to take? [. . .] I'm probably going to lose my job as a pastor after this [. . .] I think we're to a point where talk is cheap. If this makes me lose my, my reputation, I don't care." Exhibit 10.

    23.    Approximately five minutes after leaving the Rotunda, Ethridge joined a crowd of rioters in the hallway between the Rotunda and the Senate Chamber. Ethridge and the other rioters found themselves blocked by a line of MPD officers, who were protecting the Senate Chamber. The MPD officers repeatedly ordered Ethridge and the other rioters to turn around and disperse. Ethridge heard these commands, but he and the other rioters refused to leave. Eventually, the line of MPD officers forcibly pushed Ethridge and the other rioters out of the hallway. Some of the rioters, including Ethridge, attempted to physically resist the officers' efforts to move them out of the hallway, as shown in Exhibit 11.



*Exhibit 11: Ethridge in the hallway between the Rotunda and the Senate Chamber, attempting to passively physically resist officers' efforts to physically remove him from the area.*

24.     Ethridge's conduct here and in other areas of the Capitol, including his efforts to resist the officers' attempt to clear the hallway, was disorderly and disruptive, and it in fact impeded and disrupted the orderly conduct of Congress and the government business occurring in the Capitol. Indeed, throughout his time in the Capitol building and grounds it was Ethridge's intent to impede and disrupt the proceedings, and he acted willfully and knowingly.

25.     After this physical conflict with law enforcement officers, Ethridge returned to the Rotunda, where he stayed for approximately 10 minutes.

26.     Ethridge then exited the Capitol building, having spent approximately 30 minutes inside the building. While inside the building, Ethridge willfully and knowingly paraded and demonstrated in support of his intended goal to stop the certification of the presidential election results.

27.    Ethridge acted knowingly and corruptly, and with an understanding that what he was doing was unlawful, when he participated in the breach and removal of police barricades near the Peace Circle, entered the U.S. Capitol building, remained inside despite police efforts to disperse him, and physically resisted officers' efforts to expel him from the Rotunda hallway. With all of these actions, Ethridge intentionally attempted to and did in fact obstruct Congress' official proceeding to certify the results of the 2020 presidential election.

28.    In the aftermath of the riot on January 6, 2021, Ethridge was active on Facebook and Twitter, where he made statements consistent with this purpose and revealing his lack of remorse.

29.    The following posts by Ethridge on his Facebook profile, tyler.ethridge.███ with Facebook ID ███████2554, each dated January 7, 2021, are representative of Ethridge's conduct on social media in the aftermath of his invasion of the Capitol:

      a. Ethridge posted: "We weren't inspired by anyone to do what we did. We've been awakened over the past four years to a communist insurgence," and "I was there. Literally the tip of the spear. Yes, I encouraged us to press forward to the base of the Capitol. I don't regret that decision one bit." Exhibit 12.

      b. In response to comments on Ethridge's Facebook profile, Ethridge posted "It's hard for anyone who wasn't personally there to understand the moment. It truly felt like a peaceful revolution. I stand by my stance and believe we should have stormed the Capitol to peaceably protest. Read it how you want. No one was shooting at the police. Some threw water bottles at them after they shot us with rubber bullets, threw smoke grenades and pepper sprayed us." Exhibit 13.

c. An individual asked, "How did you personally get into the Capitol?" Ethridge responded, "a door behind the inauguration stage was wide open. We walked right in."

d. In response to another post, Ethridge commented, "I don't think they anticipated the storming of the Capitol. There was great push back when people tried getting to Nancy Pelosi's office, but lenience in other places in the Capitol. The greatest resistance was right at the base of where we hold the inauguration. I think inside the Capitol was fishy. Especially after seeing other footage. I didn't stay long in there. It felt iffy so I bailed shortly after entering."

30.     On Twitter, Ethridge revealed his lack of remorse for having participated in breaching the Capitol and obstructing Congress on January 6, 2021. For example, on September 24, 2021, Ethridge tweeted:

a. "They want the peaceful protestors of #January 6 to be afraid and ashamed of what we did that day. They want us to fear our sentencing for going into the Capitol. They want us to feel like what we did that day made things worse and served no purpose."

b. "A spirit I thought was long gone. It has shown me that the fight for freedom and liberty is still afoot. So my message to all who were involved in that day is this: Don't be ashamed. Don't fear. We will be vindicated. The truth will come out."

c. "Don't be afraid of what they sentence you with. I'm not. I'm ready for whatever I'll be charged with. America is still primed and ready."

31.     The parties agree that all of the above facts are true, accurate, and admissible. The parties further agree that if this case progressed to a traditional jury or bench trial, the government could and would prove all of the above facts beyond a reasonable doubt.

32.     The parties will also agree that all of the government's proposed exhibits are authentic, accurate, relevant, and admissible to prove the facts stated above and each of the charged offenses.

33.     The parties further agree that if the Court finds the existence of the above facts beyond a reasonable doubt, the defendants stipulate that this evidence would establish each and every element of the charged offenses for Counts One through Six of the Indictment, ECF No. 9.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*For Tyler Ethridge*

*/s/ Peter Cooper*
PETER COOPER
PeterCooperLaw
400 Fifth Street, NW
Suite 350
Washington, D.C. 20001
(202) 400-1434
pcooper@petercooperlaw.com

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Assistant United States Attorney, Detailee
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33602
(813) 274-6370
Michael.Gordon3@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Tyler Ethridge, have read this Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts and have discussed it with my attorney. I fully understand the elements and the facts that are set forth. I agree and acknowledge by my signature that this Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts fully.

Date: 9/8/23

TYLER ETHRIDGE
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts and have reviewed it with my client fully. I concur in my client's desire to adopt this Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts as true and accurate.

Date: 9/8/23

PETER COOPER
Attorney for Defendant Ethridge